E-FILED
Wednesday, 12 February, 2025  03:18:16 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

|  |  |
|---|---|
| GESSICA CORRIGAN, *individually and on behalf of all others similarly situated*,<br><br>    *Plaintiff,*<br><br>v.<br><br>HOSPITAL SISTERS HEALTH SYSTEM,<br><br>    *Defendant.* | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gessica Corrigan ("Plaintiff"), individually and on behalf of all similarly situated persons, brings this action against Defendant Hospital Sisters Health System ("HSHS"), alleging the following based on personal knowledge as to her own experiences and, upon information and belief, derived from, among other sources, an investigation by her counsel and a review of public records as to all other matters.

## NATURE OF THE ACTION

1.     Plaintiff brings this class action against HSHS for its failure to adequately secure and protect the personally identifiable information ("PII") and protected health information ("PHI") of Plaintiff and other similarly situated HSHS patients and employees. This sensitive data—including names, addresses, dates of birth, Social Security numbers, driver's license numbers, medical record numbers, health insurance information, and medical treatment details (collectively, the "Private Information")—was left vulnerable to criminal hackers due to HSHS's inadequate security measures.

2.      Hospital Sisters Health System, headquartered in Springfield, IL, operates a network of 13 hospitals, providing care to nearly 2 million patients annually across Illinois and Wisconsin.[1]

3.      On or around September 3, 2024, HSHS filed official notice of a hacking incident with the Attorney General of Texas.[2]

4.      On or about August 30, 2024, HSHS issued data breach notification letters (the "Notice") to individuals whose information had been compromised in the hacking incident.

5.      According to the Notice sent to Plaintiff and the "Class Members" (defined below), Defendant detected unusual activity on certain computer systems in late August 2023. In response, Defendant initiated an investigation, which later confirmed that an unauthorized party had accessed files containing sensitive patient and employee information between August 16 and August 27, 2023 (the "Data Breach"). Despite this discovery, HSHS waited over a year before notifying the public, leaving those affected unaware of their exposure and at risk.

6.      Due to this prolonged delay, Plaintiff and Class Members remained unaware for over a year that their Private Information had been compromised, leaving them vulnerable to an ongoing and substantial risk of identity theft, fraud, and other personal, social, and financial harms. This risk is not temporary but will persist for the rest of their lives.

7.      The Private Information compromised in the Data Breach contained highly sensitive patient and employee data, representing a gold mine for data thieves. The data included,

---

[1] *About Us*, HOSPITAL SISTERS HEALTH SYSTEM, https://www.hshs.org/about-us (last visited Sep. 9, 2024).
[2] *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (keyword: SEVEN SISTERS) (last visited Sep. 9, 2024).

but is not limited to, Social Security Numbers, medical record numbers, and sensitive health treatment information that HSHS collected and maintained.

8.      With the stolen Private Information obtained in the Data Breach—and a significant head start—data thieves can perpetrate a wide range of crimes, including but not limited to: opening fraudulent financial accounts in Class Members' names, securing loans under their identities, obtaining medical services using their information, fraudulently applying for government benefits, filing false tax returns, acquiring driver's licenses with Class Members' names but another individual's photograph, and providing false identification to law enforcement during an arrest.

9.      There has been no assurance offered by HSHS that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

10.      Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the forms of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

11.      Plaintiff brings this class action lawsuit to address HSHS's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiff and Class Members of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

12.     The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to HSHS, and thus HSHS was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

13.     HSHS failed to implement adequate security practices for the computer networks and systems housing the Private Information. Proper network monitoring would have enabled HSHS to detect the Data Breach sooner.

14.     Plaintiff's and Class Members' identities are now at risk because of HSHS's negligent conduct as the Private Information that HSHS collected and maintained is now in the hands of data thieves and other unauthorized third parties.

15.     Plaintiff seeks to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

16.     Accordingly, Plaintiff, on behalf of themselves and the Class, assert claims for Negligence, Negligence *Per Se*, Breach of Implied Contract, Unjust Enrichment, and Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois Personal Information Protection Act.

## PARTIES

17.     Plaintiff Gessica Corrigan is, and at all relevant times has been, a resident and citizen of the State of Illinois, where she intends to remain indefinitely.

18.     Defendant Hospital Sisters Health System is a corporation incorporated in Illinois, with its principal place of business at 4936 Laverna Road, Springfield, IL 62707, in Sangamon County.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), *et seq*. The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a state different from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20.     This Court has personal jurisdiction over Defendant because Defendant's principal places of business is located within this District and the Defendant conducts substantial business in this district.

21.     Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District, and Defendant resides within this judicial district.

## FACTUAL ALLEGATIONS

**A.      HSHS's Business.**

22.     HSHS is a multi-hospital medical system that originated as an offshoot of the Hospital Sisters of the Third Order of St. Francis in 1875 and was officially incorporated in 1978. As a leading healthcare provider, HSHS serves nearly two million patients across Illinois and Wisconsin.[3] HSHS employs more than 12,000 people and generates approximately $2.4 billion in annual revenue.[4] HSHS also partners with physician groups, including HSHS Medical Group, Prairie Cardiovascular, and Prevea Health.[5]

---

[3] *Our History*, Hospital Sisters Health System, https://www.hshs.org/about-us/our-history (last visited Feb. 11, 2025) (stating HSHS has 15 hospitals); *About Us*, Hospital Sisters Health System, https://www.hshs.org/about-us (last visited Feb. 12, 2025) (13 hospitals).
[4] *2020 Annual Report*, Hospital Sisters Health System, available at: https://www.hshs.org/HSHSFamily/media/HSHS/2020-Annual-Report_FINAL_web_1.pdf (last visited Feb. 12, 2025).
[5] *Our Family*, Hospital Sisters Health System, available at: https://www.hshs.org/our-family (last visited

23.     As a condition of receiving medical care or employment, HSHS requires patients and employees to entrust it with highly sensitive personal and health information. In the normal course of their interactions with HSHS, the Plaintiff and Class Members were obligated to provide this private information.

24.     In its Privacy Policy, HSHS assures patients that federal law requires it to protect the privacy of their Protected Health Information (PHI) and states that it will not use or disclose sensitive personal information without their express consent.[6]

25.     Given the highly sensitive and personal nature of the information HSHS collects and stores from its patients and employees, HSHS, upon information and belief, makes several commitments, including but not limited to: safeguarding their Private Information; adhering to industry standards for data security and maintenance; informing individuals of its legal obligations regarding data protection; complying with all applicable federal and state laws protecting Private Information; using and disclosing such information solely for purposes related to its services; and providing timely notice in the event of unauthorized disclosure.

26.     By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' Private Information, HSHS assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

27.     Plaintiff and Class Members relied on HSHS to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

---

Feb. 12, 2025).
[6] *Privacy Policy*, Hospital Sisters Health System, https://www.hshs.org/privacy-policy (last visited Feb. 12, 2025).

**B.    The Data Breach and HSHS's Failure to Provide Adequate Notice to the Plaintiff and Class Members.**

28.    According to Defendant's Notice, it learned of unauthorized access to its computer systems in "late August 2023," with such unauthorized access having taken place between August 16 and August 27, 2023.[7]

29.    Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including names, addresses, dates of birth, Social Security numbers, driver's license numbers, medical record numbers, health insurance information, and medical treatment information.

30.    On or around August 30, 2024, over one year after HSHS learned that the Class's Private Information was first accessed by cybercriminals, HSHS finally began to notify patients and employees that its investigation determined that their Private Information was accessed.

31.    HSHS had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

32.    Plaintiff and Class Members provided their Private Information to HSHS with the reasonable expectation and mutual understanding that HSHS would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

33.    HSHS's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

---

[7] *See Update on August 2023 Cybersecurity Incident*, Hospital Sisters Health System, https://www.hshs.org/august-2023-data-incident-update (last visited Sep. 9, 2024).

34.     HSHS knew or should have known that its electronic records would be targeted by cybercriminals.

**C.    The Healthcare Industry's Heightened Vulnerability to Data Breaches.**

35.     HSHS was on notice that companies in the healthcare industry are susceptible targets for data breaches.

36.     HSHS was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[8]

37.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:[9]

Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.

---

[8] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited on Sep. 9, 2024).
[9] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at*: https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on Sep. 9, 2024).

38.    The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach. In 2022, the largest growth in compromises occurred in the healthcare sector.[10]

39.    Healthcare-related data is among the most sensitive and personally impactful when compromised. A report on healthcare breaches found that the average total cost to resolve an identity theft-related incident was approximately $20,000. Additionally, victims were often forced to cover out-of-pocket expenses for medical services they never received in order to restore their healthcare coverage.

40.    Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.

41.    Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[11]

---

[10] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last visited on Sep. 9, 2024).
[11] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on Sep. 9, 2024).

42. As a healthcare provider, HSHS knew or should have known the critical importance of safeguarding the Private Information, including PHI, entrusted to it by patients and employees, as well as the foreseeable consequences of its unauthorized disclosure.

**D.    HSHS's Noncompliance with HIPAA.**

43. Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

44. HSHS's Data Breach resulted from a combination of insufficiencies that indicate HSHS failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from HSHS's Data Breach that HSHS either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiff's and Class Members' PHI.

45. Plaintiff's and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by C.F.R. § 160.103.

46. 45 C.F.R. § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

47. 45 C.F.R. § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

48. Plaintiff's and Class Members' Private Information included "unsecured protected health information" as defined by 45 C.F.R. § 164.402.

49.     Plaintiff's and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E, as a result of the Data Breach.

50.     Based upon Defendant's Notice to Plaintiff and Class Members, HSHS reasonably believes that Plaintiff's and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E, as a result of the Data Breach.

51.     Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

52.     HSHS reasonably believes that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

53.     Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

54.     Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach.

55.     HSHS reasonably believes that Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach.

56.     It is reasonable to infer that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

57.     It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

58.     After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 C.F.R. § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiff and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

59.     In addition, HSHS's Data Breach could have been prevented if HSHS had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

60.     HSHS's security failures also include, but are not limited to:

a.   Failing to maintain an adequate data security system to prevent data loss;

b.   Failing to mitigate the risks of a data breach and loss of data;

c.   Failing to ensure the confidentiality and integrity of electronic protected health information HSHS creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. § 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 C.F.R. § 164.306(a)(94); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. § 164.502, *et seq.*

61.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414 also required HSHS to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

62.     Because HSHS has failed to comply with HIPAA, while monetary relief may cure some of Plaintiff's and Class Members' injuries, injunctive relief is also necessary to ensure HSHS's approach to information security is adequate and appropriate going forward. HSHS still maintains the PHI and other highly sensitive PII of its current and former patients and employees, including Plaintiff and Class Members. Without the supervision of the Court through injunctive relief, Plaintiff's and Class Members' Private Information remains at risk of subsequent data breaches.

**E.     HSHS Failed to Comply with FTC Guidelines.**

63.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

64.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection

14

system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

65.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

66.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67.     The Data Breach demonstrates HSHS's failure to implement fundamental data security practices. Its inability to adopt reasonable and appropriate measures to protect against unauthorized access to the Plaintiff's and Class Members' Private Information constitutes an unfair act or practice, as prohibited by Section 5 of the FTC Act.

68.     HSHS was fully aware of its obligation to protect the Private Information of its patients and employees but failed to meet those responsibilities. The Defendant was also cognizant of the serious repercussions that would arise from its failure to do so.

**F.     HSHS's Failure to Adhere to Industry Standards.**

69.     As referenced above, Cybersecurity experts consistently identify businesses as prime targets for cyberattacks due to the valuable Private Information they collect and maintain.

70.    The Center for Internet Security (CIS) Critical Security Controls (CSC) outlines essential best practices for securing data and preventing cyberattacks. These include controls such as Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account and Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[12]

71.    The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

    a.   Control who logs on to your network and uses your computers and other devices.

    b.   Use security software to protect data.

    c.   Encrypt sensitive data, at rest and in transit.

    d.   Conduct regular backups of data.

    e.   Update security software regularly, automating those updates if possible.

    f.   Have formal policies for safely disposing of electronic files and old devices.

    g.   Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

---

[12] *The 18 CIS Critical Security Controls*, Center For Internet Security, https://www.cisecurity.org/controls/cis-controls-list (last visited on Jan. 19, 2025).

72.    The Cybersecurity and Infrastructure Security Agency (CISA) recommends organizations take specific measures to defend against cyberattacks, including: (a) requiring multi-factor authentication for remote and privileged access, ensuring software is updated, and disabling unnecessary ports and protocols; (b) enabling cybersecurity personnel to detect unusual network behavior and ensuring antivirus software is up to date; and (c) ensuring preparedness for incident response in the event of an intrusion.[13]

73.    Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls, which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

## G.    HSHS's Failure to Safeguard the Plaintiff's and Class Members' Private Information.

74.    In addition to its obligations under federal and state laws, HSHS owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. HSHS owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry

---

[13] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited Jan. 19, 2025).

standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

75.     HSHS breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. HSHS's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

      a.   Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

      b.   Failing to adequately protect patients' and employees' Private Information;

      c.   Failing to properly monitor its own data security systems for existing intrusions;

      d.   Failing to sufficiently train its employees regarding the proper handling of its patients' and employees' Private Information;

      e.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

      f.   Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

      g.   Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

76.     HSHS negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

77.     Had HSHS remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in

the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

78.      Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What is more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with HSHS.

**H.**     **HSHS Should Have Known That Cybercriminals Target PII and PHI for Fraud and Identity Theft.**

79.      The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[14]

80.      Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

81.      Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

---

[14] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Sep. 9, 2024).

82.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number.

83.     As technology advances, computer programs can now scan the internet more broadly, creating a mosaic of information that links compromised data to individuals in ways that were previously impossible. This is known as the "mosaic effect." Personal details such as names, dates of birth, and contact information—like phone numbers and email addresses—are highly valuable to hackers and identity thieves, as they can be used to gain access to other accounts.

84.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

85.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[18] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

86.     Indeed, the PII and PHI of individuals remain of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[15]

87.     Further, even information such as names, email addresses and phone numbers can have value to a hacker. Beyond things like spamming affected individuals, or launching phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual. It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[16]

88.     Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails. If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

89.     One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[17]

---

[15] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs (last visited on Jan. 17, 2025).
[16] *See Dark Web Price Index: The Cost of Email Data,* MAGICSPAM, https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/ (last visited on Jan. 17, 2025).
[17] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

90.    Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of information can be derived not only by a price at which consumers or hackers actually seek to sell it, but also by the economic benefit consumers derive from being able to use it and control the use of it.

91.    An individual's ability to use their PII and PHI is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user. In this sense, among others, the theft of PII and PHI in the Data Breach led to a diminution in value of that data.

92.    Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiff's PII impairs her ability to participate in the economic marketplace.

93.    The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[18]

94.    It is important to note that there can be a significant time lag between when harm occurs and when it is discovered, as well as between the theft of PII and PHI and its eventual use. According to a study conducted by the U.S. Government Accountability Office on data breaches:[19]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may

---

[18] *2023 Consumer Impact Report* (Jan. 2024), Identity Theft Resource Center, *available online at*: https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-
1.pdf (last visited on Feb. 12, 2025).

[19] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. Government Accountability Office (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited on Feb. 12, 2025).

continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

95.     PII and PHI are valuable commodities to identity thieves because once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

96.     And while credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the InfoSec Institute.[20]

97.     PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

98.     Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[21]

---

[20] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on Feb. 12, 2025).

[21] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on Feb. 12, 2025).

99.    The ramifications of HSHS's failure to keep its patients' and employees' Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

100.    Here, not only was sensitive medical information compromised, but Security numbers were compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

101.    As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**PLAINTIFF CORRIGAN'S EXPERIENCES**

102.    Plaintiff Corrigan is an active patient of HSHS. As a condition of receiving medical services, she was required to provide the Defendant with her Private Information. In doing so, Plaintiff reasonably expected that her information would be safeguarded and not accessed by unauthorized third parties.

103.    Plaintiff Corrigan received HSHS's Data Breach notice. The notice informed Plaintiff that her Private Information was improperly accessed and obtained by third parties.

104.    As a result of the Data Breach, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

24

105.    As a result of the Data Breach, Plaintiff her suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her Private Information for purposes of identity theft and fraud. Plaintiff is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

106.    Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

107.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## CLASS ACTION ALLEGATIONS

108.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23.

109.    Plaintiff proposes the following Class, subject to amendment as appropriate: All U.S. citizens whose Private Information was accessed and/or compromised as a result of the Data Breach, including those who received notice of the breach (the "Class").

110.    Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal

representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

111. Plaintiff reserves the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

112. The proposed Class meets the prerequisite criteria for certification under Fed. R. Civ. P. 23.

113. <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of thousands of patients and employees of HSHS whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through HSHS's records, Class Members' records, publication notice, self-identification, and other means.

114. <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether HSHS engaged in the conduct alleged herein;

b. Whether HSHS's conduct violated the FTCA, HIPAA, and/or Illinois Consumer Fraud and Deceptive Business Practices Act;

c. When HSHS learned of the Data Breach

d. Whether HSHS's response to the Data Breach was adequate;

e. Whether HSHS unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f.   Whether HSHS failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.   Whether HSHS's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.   Whether HSHS's data security systems prior to and during the Data Breach were consistent with industry standards;

i.   Whether HSHS owed a duty to Class Members to safeguard their Private Information;

j.   Whether HSHS breached its duty to Class Members to safeguard their Private Information;

k.   Whether hackers obtained Class Members' Private Information via the Data Breach;

l.   Whether HSHS had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.   Whether HSHS breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.   Whether HSHS knew or should have known that its data security systems and monitoring processes were deficient;

o.   What damages Plaintiff and Class Members suffered as a result of HSHS's misconduct;

p.   Whether HSHS's conduct was negligent;

q.   Whether HSHS was unjustly enriched;

r.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring, as well as monetary relief; and

t.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the creation of a constructive trust.

115.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of HSHS. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

116.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

117.  <u>Predominance</u>. HSHS has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from HSHS's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

118.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for HSHS. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

119.    Class certification is also appropriate because HSHS acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

120.    All members of the proposed Class are readily ascertainable. HSHS has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by HSHS.

### COUNT I
### NEGLIGENCE
### (On Behalf Of Plaintiff And The Class)

121.    Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein. HSHS knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding,

securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

122.    HSHS's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

123.    HSHS knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. HSHS was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

124.    HSHS owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. HSHS's duties included, but were not limited to, the following:

      a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

      b.    To protect patients' and employees' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

      c.    To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

      d.    To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA, the FTCA and the Illinois Consumer Fraud and Deceptive Business Practices Act;

      e.    To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.   To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

125.   HSHS's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

126.   HSHS's duty also arose because Defendant was bound by industry standards to protect its patients' and employees' confidential Private Information.

127.   Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and HSHS owed them a duty of care to not subject them to an unreasonable risk of harm.

128.   HSHS, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within HSHS's possession.

129.   HSHS, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

130.   HSHS, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

131.   HSHS breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

132.    HSHS acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

133.    HSHS had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust HSHS with their Private Information was predicated on the understanding that HSHS would take adequate security precautions. Moreover, only HSHS had the ability to protect its systems (and the Private Information that it stored on them) from attack.

134.    HSHS's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised, exfiltrated, as alleged herein.

135.    HSHS's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

136.    As a result of HSHS's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

137.    HSHS also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

138.    As a direct and proximate result of HSHS's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

139.    The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

140.    Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

141.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring HSHS to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

<u>**COUNT II**</u>
**NEGLIGENCE *PER SE***
**(On Behalf Of Plaintiff And The Class)**

142.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

143.    Pursuant to Section 5 of the FTCA, HSHS had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

144.    Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., HSHS had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

145.    Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

146.    HSHS breached its duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

147.    Specifically, HSHS breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

148.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of HSHS's duty in this regard.

149.    HSHS also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

150.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to HSHS's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

151.    Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and HSHS's failure to comply with both constitutes negligence *per se*.

152.    Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to HSHS's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

153.    As a direct and proximate result of HSHS's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

154.    As a direct and proximate result of HSHS's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

155.    In addition to monetary relief, Plaintiff and Class Members are entitled to injunctive relief requiring HSHS to, among other things, enhance its data security systems and monitoring

procedures, conduct regular audits of these systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

### COUNT III
### BREACH OF IMPLIED CONTRACT
**(On Behalf Of Plaintiff And The Class)**

156.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

157.    HSHS provides medical services and/or employment positions to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members paying for services and/or providing their labor and/or entrusting their valuable Private Information to Defendant in exchange for such services and/or employment positions.

158.    Through Defendant's sales and/or employment with Plaintiff and Class Members, it knew or should have known that it must protect Plaintiff's and Class Members' confidential Private Information in accordance with its policies, practices, and applicable law.

159.    As consideration, Plaintiff and Class Members paid money and/or provided their labor to HSHS and/or turned over valuable Private Information to HSHS. Accordingly, Plaintiff and Class Members bargained with HSHS to securely maintain and store their Private Information.

160.    HSHS accepted payment and/or possession of Plaintiff's and Class Members' Private Information for the purpose of providing services and/or employment positions to Plaintiff and Class Members.

161.    In paying Defendant and/or providing their valuable Private Information to Defendant in exchange for Defendant's services, Plaintiff and Class Members intended and understood that HSHS would adequately safeguard the Private Information as part of those services.

162.    Defendant's implied promises to Plaintiff and Class Members include, but are not limited to: (1) ensuring that anyone granted access to Private Information also safeguards its confidentiality; (2) restricting access to Private Information within its organization to those with a legitimate business need; (3) limiting access to qualified and trained employees or agents; (4) establishing and enforcing retention policies to protect against criminal data breaches; (5) implementing appropriate encryption measures; (6) requiring multifactor authentication for access; (7) adhering to HIPAA standards to ensure the protection of Plaintiff's and Class Members' PHI; and (8) taking additional steps to prevent foreseeable data breaches.

163.    Plaintiff and Class Members would not have entrusted their Private Information to HSHS in the absence of such an implied contract.

164.    Had HSHS disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to HSHS.

165.    As a provider of healthcare, HSHS recognized (or should have recognized) that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and the other Class Members.

166.    HSHS violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information. HSHS further breached these implied contracts by failing to comply with its promise to abide by HIPAA.

167.    Additionally, HSHS breached the implied contracts with Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic protected health

information it created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1).

168.    HSHS also breached the implied contracts with Plaintiff and Class Members by failing to implement technical policies and procedures for electronic systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1).

169.    HSHS further breached the implied contracts with Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1).

170.    HSHS further breached the implied contracts with Plaintiff and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii).

171.    HSHS further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. § 164.306(a)(2).

172.    HSHS further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected

health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3).

173.    HSHS further breached the implied contracts with Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce violations, in violation of 45 C.F.R. § 164.306(a)(94).

174. HSHS further breached the implied contracts with Plaintiff and Class Members by impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. § 164.502, *et seq*.

175. HSHS further breached the implied contracts with Plaintiff and Class Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in violation of 45 C.F.R. § 164.530(c).

176. HSHS further breached the implied contracts with Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PHI.

177. A meeting of the minds occurred, as Plaintiff and Class Members agreed to provide payment and/or accurate, complete Private Information to HSHS in exchange for HSHS's commitment to, among other things, deliver services that included safeguarding their highly sensitive Private Information.

178. Plaintiff and Class Members have suffered damages as a result of HSHS's conduct, including the harms and injuries stemming from the Data Breach, both present and future, as detailed herein.

### COUNT IV
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("CFA"), 815 ILCS 505/1, *ET SEQ.*
### (On Behalf Of Plaintiff And The Class)

179. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

180. Plaintiff and Class Members are "consumers" as defined in 815 ILCS 505/1(e). Plaintiff, the Class, and Defendant are "persons" as defined in 815 ILCS 505/1(c).

181.     Defendant engaged in "trade" or "commerce," including the provision of services, as defined under 815 ILCS 505/1(f). Defendant engages in the sale of "merchandise" (including services) as defined by 815 ILCS 505/1(b) and (d).

182.     Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the CFA, including: (i) failing to maintain adequate data security to keep Plaintiff's and the Class Members' sensitive Personal Information from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act and HIPAA; (ii) failing to disclose or omitting materials facts to Plaintiff and the Class regarding their lack of adequate data security and inability or unwillingness to properly secure and protect the Personal Information of Plaintiff and the Class;

(iii) failing to disclose or omitting materials facts to Plaintiff and the Class about Defendant's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the Personal Information of Plaintiff and the Class; and (iv) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff's and the Class's Personal Information and other Personal Information from further unauthorized disclosure, release, data breaches, and theft.

183.     These actions also constitute deceptive and unfair acts or practices because Defendant knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiff and the Class and defeat their reasonable expectations about the security of their Personal Information.

184.    Defendant intended that Plaintiff and the Class rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services and employment positions.

185.    Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Class. Plaintiff and the Class have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

186.    Defendant also violated 815 ILCS 505/2 by failing to immediately notify Plaintiff and the Class of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et seq*.

187.    As a result of Defendant's wrongful conduct, Plaintiff and the Class were injured in that they never would have provided their Personal Information to Defendant, or purchased Defendant's services, had they known or been told that Defendant failed to maintain sufficient security to keep their Personal Information from being hacked and taken and misused by others.

188.    As a direct and proximate result of Defendant's violations of the CFA, Plaintiff and the Class have suffered harm, as alleged herein.

189.    Pursuant to 815 ILCS 505/10a(a), Plaintiff and the Class seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the CFA.

### COUNT V
### UNJUST ENRICHMENT
### (On Behalf Of Plaintiff And The Class)

190.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

191.    This Count is plead in the alternative to Count III.

192.    Plaintiff and Class Members conferred a benefit on HSHS by turning over their Private Information to Defendant and by paying for products and services and/or providing their labor to Defendant that should have included cybersecurity protection to protect their Private Information. Plaintiff and Class Members did not receive such protection.

193.    Upon information and belief, HSHS funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiff and Class Members.

194.    As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to HSHS.

195.    HSHS has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

196.    HSHS knew that Plaintiff and Class Members conferred a benefit upon it, which HSHS accepted. HSHS profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

197.    If Plaintiff and Class Members had known that HSHS had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant or obtained services and/or employment positions at Defendant.

198.    Due to HSHS's conduct alleged herein, it would be unjust and inequitable under the circumstances for HSHS to be permitted to retain the benefit of its wrongful conduct.

199.    As a direct and proximate result of HSHS's conduct, Plaintiff and Class Members have and will suffer injuries, as alleged herein.

200.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from HSHS and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by HSHS from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

201.    Plaintiff and Class Members may not have an adequate remedy at law against HSHS, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### COUNT VI
### VIOLATION OF THE ILLINOIS PERSONAL INFORMATION PROTECTION ACT
### 815 ILCS 530/1, *et seq.*
### (On Behalf Of Plaintiff And The Class)

202.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

203.    The Illinois Personal Information Protection Act ("PIPA"), 815 ILCS 530/1, *et seq.*, obligates "data collectors" that own, license, maintain or store records that contain personal information of Illinois residents to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure." 815 ILCS 530/45.

204.    Additionally, the PIPA creates a duty for data collectors to notify Illinois residents of any data breach "immediately following discovery" of the data breach. 815 ILCS 530/10(b).

205. Defendant is a "data collector" as defined by PIPA.

205.    Defendant failed to implement and maintain reasonable security measures to safeguard, protect and keep confidential Plaintiff's and Class members' PII from unauthorized access or disclosure, as alleged herein.

206.    Defendant, knowing and/or reasonably believing that Plaintiff's and Class members' PII was acquired or accessed by unauthorized persons during the Data Breach, failed to provide prompt, immediate, and reasonable notice of the Data Breach to Plaintiff and the Class members as required by PIPA.

207.    Defendant's failure to implement and maintain reasonable security measures to protect Plaintiff's and Class members' PII, and/or Defendant's failure to provide timely and accurate notice of the Data Breach violated the PIPA.

208.    As a result of Defendant's failure to reasonably safeguard the PII belonging to Plaintiff and the Class, and Defendant's failure to provide reasonable and timely notice of the Data Breach to Plaintiff and the Class, Plaintiff and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

1.    An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Class as requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiff is a proper representative of the proposed Class;

2.    For injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

3.    For an award of compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined;

44

4.      For an award of restitution or disgorgement, in an amount to be determined;

5.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

6.      For prejudgment interest on all amounts awarded; and

7.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED: February 12, 2025                    Respectfully submitted,

                                            */s/Hassan A. Zavareei*
                                            Hassan A. Zavareei (Bar No. 456161)
                                            Katherine M. Aizpuru (*pro hac vice forthcoming*)
                                            David W. Lawler (*pro hac vice forthcoming*)
                                            **TYCKO & ZAVAREEI LLP**
                                            2000 Pennsylvania Avenue, NW
                                            Suite 1010
                                            Washington, D.C. 20006
                                            Phone: (202) 973-0900
                                            hzavareei@tzlegal.com
                                            kaizpuru@tzlegal.com
                                            dlawler@tzlegal.com

                                            *Counsel for Plaintiff and the Proposed Class*